Filed 7/25/25  S.R. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| S.R., | |
| Petitioner, | E085977 |
| v. | (Super.Ct.No. DPSW2300053) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Sean P. Crandell, Judge.  Petition denied.

Mitchell R. Vande Witte for Petitioner.

No appearance for Respondent.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel for Real Party in Interest.

1

S.R. (Father) challenges by this writ petition (Welf. & Inst. Code,[1] § 8.452) the juvenile court's order setting a permanent plan selection and implementation hearing (see § 366.26; hereafter, .26 hearing) for A.R. (a girl, born May 2019) and A.R.-R. (a girl, born February 2023; collectively, Minors). Minors were removed from Father's custody upon A.R.-R.'s birth, based on his failure to protect them from their mother's drug abuse and serious mental health issues, his history of domestic violence, and his failure to provide for their needs. Father did not live with Minors before the dependency, and he rarely visited them in foster care, averaging just a handful of visits a year over the course of two years. He contends, contrary to the juvenile court's findings, that no evidence of emotional detriment supports their continued removal from his custody and control. We disagree. We therefore deny Father's petition.

## BACKGROUND

In February 2023, A.R.-R. was born prematurely at 34 weeks' gestation. J.R. (Mother) tested positive for opiates and admitted she "ditched" prenatal care out of fear her regular methamphetamine use would be discovered. Mother acknowledged an entrenched history of methamphetamine abuse dating back almost 10 years to when she was 18 years old. Two stints in "rehab" had not helped, including most recently a year ago. Mother also disclosed significant mental health diagnoses, including bipolar disorder, posttraumatic stress disorder, and depression. She left her condition untreated, last taking medication in 2016. Mother told a family member she had relapsed on drugs,

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

was "often" transient, could not keep a consistent phone number, and had "issues" with domestic violence.

Mother earlier lost custody of a son whom she relinquished from birth to a maternal cousin, at first voluntarily but then by court order. Additionally, A.R. and her older half-sister, B.R., each resided since birth with their maternal grandmother (MGM). Mother did not live there and could not care for them because of her drug use, poor mental health, and itinerant living "from place to place." MGM barred Father from her home because of domestic violence. B.R., who was seven years old when A.R.-R. was born, disclosed that she "sometimes" feared Father, who "choked" Mother on a visit to the beach.

Just before A.R.-R.'s birth, Mother had been living in a motel on a 16-day homeless voucher. Before that, she lived for an undisclosed time "on the road" with Father, a long-haul trucker. When A.R.-R. was born, Mother had no provisions to care for her, and appeared to have no support.

In a telephone interview with a social worker, Father gave only vague, evasive responses. He knew Mother struggled with drugs, but denied knowing she resumed her drug habit after leaving a treatment program a year ago. He did not ensure prenatal care for A.R.-R. He refused to discuss domestic violence concerns. A prior welfare agency referral included allegations he punched Mother, dragged her to the floor by her hair, and attempted to leave the home with A.R., but Mother "jumped on his back and bit him on the shoulder." A.R. was caught up in the altercation and had sustained a scratch on her arm. Mother sought a domestic violence restraining order the next month, but whether it

was based on the same incident was unclear; the matter was dismissed when neither parent appeared.

Real party in interest Riverside County Department of Public Social Services (the Department) obtained protective custody warrants for Minors. A.R.-R. was still in the neonatal intensive care unit, and A.R. remained with B.R. at MGM's home. After two weeks in the hospital, A.R.-R. was discharged to a foster caregiver. Around the same time, Mother tested positive for amphetamine and continued to test positive throughout the dependency.

The juvenile court sustained jurisdiction over Minors, finding, on an amended petition, that father failed to protect them. (§ 300, subd. (b).) In particular, the court found true allegations that he and Mother engaged in domestic violence that included punching, choking, and hitting, and that the abuse put Minors at risk of physical and emotional harm. The court also found regarding the safety of Minors, especially A.R.-R., that Father knew or should have known Mother abused substances. Further, Father did not live with or provide a home for Minors and failed to ensure they had adequate necessities, exposing them to a substantial risk of emotional and physical harm. The court also found Mother and Father failed to benefit from services on a previous referral that included allegations of neglect and, again, both emotional and physical abuse. The juvenile court ordered reunification services.

Over the next two years Father rarely visited Minors. Father's documented 2023 visits included once in March by a video call, and once each in person in April, May, and December. Father blamed his trucking job, asserting he was "gone for two-three weeks at

4

a time." But as early as May 2023, Mother expressed concern that Father did not visit Minors even when "in the area." He requested a visit in October 2023 but then did not show for it, though the caregivers waited for him. At a child-family team meeting in November 2023, A.R.-R.'s foster family expressed concern about both parents' absence from her life, noting that the child had grown to be "afraid of strangers."

Father's visits remained infrequent throughout 2024. He missed scheduled calls with Minors in February, and twice each in March and April, as well as in-person visits in April and May. Father was "not driving his truck" in May through early June, according to Mother, but nothing indicates he visited Minors. He missed four video call visits in July. The record reflects no visits with Minors until he called the Department on September 10, 2024, and the Department arranged a visit the next day. He missed video or phone call visits in September and October, and made one in-person visit in early November, despite being local for 30 days that month.

In 2025, Father visited once in January and other times by telephone, but another in-person visit that month was canceled when he failed to confirm it. A.R.'s caregiver reported that Father tended "to call at his convenience rather than adhering to the agreed-upon schedule." Father made it to visits at the beginning and end of February, but missed two other visits that month and many in March. He told a social worker in March that he been unemployed since January, "stating that he chose to stay close to home to be more available for his children." He also admitted, however, that his driver's license had been "revoked due to child support-related issues."

A.R.'s emotional difficulties had increased in the new year. She was removed from MGM's home and placed in a foster home at the end of February. Father did not confirm his scheduled visits with her or A.R.-R. the first three weeks of March, so they were canceled. On a recorded video call with A.R.-R. in February, Father began to curse and argue with his girlfriend, so the call monitor terminated it. At her new foster home, A.R. in mid-March became inconsolable; when she calmed down, she reported she had a nightmare "in which her father had violently harmed her, her mother, and her sister [B.R.] with a hammer." A.R.'s emotional regulation continued to degrade. A few days later, she "would not stop crying, refused to get out of bed, and would not eat her breakfast." The caregiver subsequently submitted a 14-day notice for A.R. to be removed from her home, which was superseded when A.R. kicked the caregiver and was immediately placed elsewhere. The new foster caregiver reported that five-year-old A.R. continued to struggle with intense tantrums; these included public outbursts involving "uncontrollable crying and screaming episodes."

Father's visit with A.R.-R. in early April 2025 ended in distress. The child packed up her own diaper bag to leave the visiting room, but Father told her that his visit was not over yet and she began to cry. From the couch, Father "tried to console her from afar." A.R.-R. had lived with her caregiver for two years since birth at that point. Father became upset when the visitation assistant tried to console A.R.-R. in Spanish (A.R.-R.'s first language), and he accused the assistant of calling the foster parent "mama." The visit ended early. Father missed his visit the next week, the last one before the juvenile court held a review hearing at the 24-month mark.

At the hearing, counsel for Father offered explanations for many of the missed visits, including that Father had a flat tire for the last one. More generally, counsel emphasized Father's trucking employment "until . . . a few months ago." Counsel acknowledged Father had "an issue with his license very recently," which he "expected to be remedied," and, in the meantime, his mother, who was at the hearing, could "provide any transportation," including for the girls. Stressing Father's effort "to do everything he needed to do," including completing his services, which was uncontested, together with "his work schedule, his other child, [and] communication issues with the Department," Father requested that the court return Minors to his care.

The Department and Minors' counsel opposed Father's request. The Department emphasized visitation as "the most important part of the reunification process." Yet, despite the benefit of "additional time" from "multiple continuances" due to circumstances involving B.R. and B.R.'s father, neither Father nor Mother "utilize[d] this time to build a strong relationship with their children." Instead, Father in particular "only had approximately 12 to 20 in-person visits over a two-year period of time," by the Department's estimate. The Department argued the evidence "overwhelmingly demonstrates that mother and father . . . have failed to maintain consistent and positive contact with their children over the last 26 months."

Minors' counsel concurred, noting Father struggled with "basic things like transportation, work, and making it to visitation." Minors' counsel argued, "[a]t the risk of sounding harsh," that Father and Mother "are basically strangers to [A.R.-R.] at this point" and that "return to either parent would be detrimental to her emotional well-

7

being." Minors' counsel summarized the same being true as to A.R., namely, "it would be detrimental to her emotional—as well as physical well-being."

The trial court acknowledged various difficulties Father encountered in making visits, such as the flat tire, which, when "the person ha[s] been consistently visiting," would not count "against someone at a hearing like this." "But," the court observed, "it's also a matter of consistency," and Father's lack of visitation "hasn't been a momentary problem." The court's notes reflected " 'visitation was an issue' " over the entire course of the case, and not just limited to in-person visits. Past entries in the court's notes included: " 'Missed a majority of his scheduled calls,' " " 'Visits are very inconsistent,' " and " 'Misses video visits and was late for an in-person birthday visit for one of the children.' " The court terminated reunification services, kept Father's visits with A.R. on a weekly basis, reduced those with A.R.-R. to monthly, and set a .26 hearing. The court emphasized again the importance of consistent visitation for young children and advised Father and Mother that, "If you do attend those visits, . . . your attorneys will explain the mechanisms you have available . . . to change the order that occurred today."

## DISCUSSION

Father challenges the sufficiency of the evidence to support the juvenile court's order declining to return Minors to his care and instead terminating reunification services and setting a .26 hearing to select a permanent plan for Minors. The court did not err.

Section 366.25 provides that when the juvenile court holds a review hearing 24 months into a dependency, "[a]fter considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of their parent or legal

guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (*Id.* subd. (a)(1).) The burden rests on the Department to show the requisite harm. (*Ibid.*) "[T]he risk of detriment must be substantial, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) We apply the deferential substantial evidence test in reviewing the juvenile court's decision refusing to place Minors with Father. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252.)

Father argues the Department failed to show any substantial risk of harm to Minors, in particular "any actual harm that would be suffered" if Minors were returned to his care. According to Father, the juvenile court simply "made assumptions, without evidentiary support, that there would be a substantial risk of emotional detriment because of inconsistent visitation." We disagree.

The record amply showed Father's lack of visits caused actual harm by contributing to Minors' emotional fragility and created a risk of substantial, further emotional harm. A.R.-R. suffered from a fear of strangers that, tragically, included her parents. Father's presence gave her no joy or solace and he did not know how to console her when needed. His infrequent attempts only illustrated the emotional distance between them: even when physically present, soothing her from across the room on a couch predictably failed. The juvenile court reasonably could infer that Father's lack of visits caused or exacerbated this emotional chasm and detriment. The court aptly noted

9

the importance of visitation to young children in forming bonds, as Father was repeatedly told, to no avail. As the Department observed, A.R.-R. "is now two years old and has not formed any attachment whatsoever to [F]ather . . . as he has only visited her a few times in a two-year period of time. While he did seem to make approximately half of his scheduled video visits . . . , a video visit does not replace the need of a small child to become familiar and bond with a parent."

The same emotional harm and risk of continued harm were apparent in Father's relationship with A.R., if not more pronounced. Far from comfort, peace, or support, he gave her nightmares. And with A.R. "going through a lot right now being removed from [MGM] and cycling through foster care placement[s]" while suffering "these emotional outbursts she's having," Minors' counsel aptly questioned: "[W]hen [Father] cannot even make the scheduled visitation, how can the Court have any confidence that's he's going to be able to meet all of the needs that she has?" Nor was it "a small window in time where he has struggled to make visit[s]." Rather, Father's only consistent trait in Minors' lives was his absence, even by virtual connection. The detriment was palpable, for, as recognized by the court: "When kids look forward to a visit and then the visits don't happen, that causes kids a lot of distress."

While Father blamed first his trucking job and then, when he lost it, made a host of other excuses, the record supports the conclusion he did not visit even when he had the chance to do so, and missed video and telephone visits, too. Substantial evidence supports the social worker's assessment that Father failed in the reunification period to demonstrate any commitment to being a stable, emotionally available caregiver for

10

Minors.  The evidence supports the juvenile court's conclusion that, as a result, Minors

suffered palpable, substantial emotional harm and were at risk of continuing detriment.

**DISPOSITION**

Father's petition for an extraordinary writ to overturn the juvenile court's order is

denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER _____
                                                                        J.


We concur:


RAMIREZ _____
                        P. J.


CODRINGTON _____
                        J.

11